#### UNITED STATES v. CERTAIN LANDS IN BUTLER COUNTY, PA., et al.

Civ. A. No. 5817.

United States District Court
W. D. Pennsylvania.

Jan. 31, 1949.

Owen M. Burns, U. S. Atty., and Elliott W. Finkel, Sp. Asst. to U. S. Atty., both of Pittsburgh, Pa., for petitioner.

H. F. Stambaugh, Sp. Counsel, of Harrisburg, Pa., H. Albert Lehrman and William M. Rutter, Deputy Attys. Gen., and James H. Duff, Atty. Gen., for defendants.

GIBSON, Chief Judge.

The United States has filed a Motion for Judgment of Just Compensation, which requests this Court to decree that the sum specified in the sublease and agreement, $2,512,297.39, is the just compensation for the taking of the hospital. It is the Commonwealth's position, in opposing this motion, that the sum specified in the sublease and agreement is not just compensation because the execution of this sublease by the agencies of the Commonwealth was ultra vires; and the letter of December 28, 1945, from the Division Engineer of the War Department, constituted a surrender of the sublease which prevents the United States from asserting the agreement.

In condemnation proceedings instituted by the United States against lands of the Commonwealth it has been the practice in the past for the Attorney General and the Governor of the Commonwealth to fix the

just compensation by agreement with the representatives of the United States. However, in this particular proceeding it is urged by the Commonwealth that the agreement fixing the just compensation was, in effect, a "sale" of real estate within the prohibition of the Pennsylvania Administrative Code. 71 P.S. § 51 et seq.

■ It is the opinion of the Court that the meaning of "sale" should not be extended to include agreements fixing the compensation in condemnation proceedings which are necessarily involuntary on the part of the owner. The parties either agree upon the amount of just compensation or accept the award made by the Court.

The hospital consisted of twelve buildings at the time the sublease was executed. It was a reasonable arrangement providing necessary protection for the Federal Government with adequate consideration to the State, for the parties to agree upon the just compensation for these twelve buildings before the United States converted them into an operating plant at a cost of $4,000,000, when a correct appraisal would be extremely difficult.

■ In addition, the defense of ultra vires does not necessarily mean that the agreement is unenforceable. In equity and good conscience the Commonwealth cannot maintain this defense at this time.

■ The United States filed its condemnation proceedings before the expiration of the term of the sublease. The letter from the Division Engineer of the War Department did not constitute a surrender of the sublease. It was notice that the tenant would vacate at the end of the term. It had the same effect as the tenant's failing to renew the sublease on December 1, 1945. It was possible, however, that the Commonwealth, upon receipt of this letter, could have acted in such a manner that the United States would now be estopped to assert the agreement. The investigation conducted by the Secretary of Welfare of the Commonwealth did not amount to such a change of position.

The motion of the petitioner should be granted.

The Court, after hearing and consideration, makes the following Findings of Fact and Conclusions of Law:

Findings of Fact.

1. The General State Authority, a public corporation and government instrumentality of the Commonwealth of Pennsylvania, erected in the year 1940 in Butler County, Pennsylvania, a certain establishment known as the Western Pennsylvania Tubercular Sanitorium (hereinafter referred to as the "Hospital").

2. This was a W. P. A. project and the United States of America contributed funds to the extent of $386,756.87 toward the construction and furnishing of this hospital.

3. The General State Authority leased the hospital to the Department of Property and Supplies of the Commonwealth of Pennsylvania for a term beginning November 1, 1939 and ending June 1, 1968.

4. On October 23, 1942, the Authority as owner, the Department as subleassor, and the United States of America as sublessee, executed a sublease and agreement by which the hospital was leased to the United States for the period October 23, 1942 to June 30, 1943.

5. This sublease provided that by mutual agreement it could be renewed from year to year, but not beyond May 1, 1968, provided the United States gave written notice to the Department at least six months before the sublease or any renewal thereof would otherwise expire.

6. The agreement called for an annual rental of $160,000 with the provision that the United States could increase its annual rental payments, and when it had paid approximately $2,699,835 in rent, the rent would be reduced to $1.00 per year for the remaining life of the sublease or any renewals thereof.

7. The sublease further provided that in the event the United States decided to acquire fee simple title to the hospital by judicial proceedings, then the sum of $2,699,835 (less certain deductions) "shall be the amount of the award to be decreed for all damages and compensation by reason of the taking of fee simple title to said

property, and that this sublease and agreement shall constitute a stipulation which may be filed in such proceedings, and shall be final and conclusive evidence of the true value of the estate taken and of the proper award to be made in such proceedings."

8. The United States entered into possession under this sublease in October, 1942, and has remained in possession since that time.

9. At the time the United States entered, the hospital consisted of twelve buildings. While in possession as a tenant the United States erected certain permanent additions and structures at a cost of approximately $4,000,000.

10. The United States gave notices of renewal of sublease, in writing, to the Department on December 1, 1942 for the year beginning July 1, 1943 and ending June 30, 1944; on December 1, 1943 for the year beginning July 1, 1944 and ending June 30, 1945; and on December 1, 1944 for the year beginning July 1, 1945 and ending June 30, 1946.

11. The sublease was not renewed for the next year, instead, on December 28, 1945, the Department received a letter from the Division Engineer, Middle Atlantic Division of the War Department, informing them that the United States would not require these premises for hospital purposes after June 30, 1946. The letter suggested the possibility that the Government may not be able to remove all of its equipment by that date, in which event, the Government would desire 30 to 90 days beyond the expiration of the sublease.

12. Sometime late in December, 1945, or early January, 1946, General Bradley conferred with Governor Martin and informed him that the hospital was not suitable for a veterans' hospital, and that it would be returned to the Commonwealth.

13. Early in January, 1946, Governor Martin conveyed this information to the Secretary of Welfare of the Commonwealth with instructions to investigate the possibility of transferring the mental hospital at Dixmont to this hospital.

14. On January 16, 1946, the Secretary of Welfare submitted a report to Governor Martin, wherein, she stated that her department had surveyed the hospital and was preparing an estimate of changes necessary to condition the hospital for mental patients; that she had requested the Secretary of Property and Supplies to obtain from the federal officers an inventory of the equipment owned by the Federal Government with the appraised value, and the terms under which it could be purchased; and that she was going to request the Secretary of Property and Supplies to develop procurement procedure to acquire possession of this equipment.

15. On February 15, 1946, General Bradley wrote to Governor Martin stating that he had been in receipt of urgent requests from citizens of Pennsylvania, for the Veterans Administration to acquire this hospital; and if the Government found that it would be suitable for conversion to a Veterans' hospital, would the Commonwealth sell the hospital. Governor Martin replied that the hospital could be purchased by the United States Government for $4,000,000.

16. On May 7, 1946, the Federal Board of Hospitalization adopted a resolution, which was approved by the President on June 5, 1946, authorizing the Veterans Administration to purchase this hospital.

17. The War Department transferred the sublease and agreement here in question to the Veterans Administration on June 14, 1946.

18. On June 26, 1946, the United States filed a Petition in Condemnation in which it condemned the fee simple title to the hospital for the public use of the United States.

19. On July 18, 1946, General Bradley, Administrator of Veterans Affairs, filed a Declaration of Taking and deposited in the registry of this court $2,512,297.39 as the estimated just compensation, and at which time, this Court decreed that the fee simple title to these premises vested in the United States of America.

20. In October, 1946, the United States amended its petition by averring that the amount of just compensation should be the sum specified in the sublease and agreement.

21. The Authority, the Commonwealth of Pennsylvania, and the Department deny that $2,512,297.39 is just compensation for the reason that the sublease and agreement

is not binding on the Commonwealth because none of the officials had authority to execute the agreement, and further, the United States had surrendered the sublease.

22. The parties have agreed that if the sublease and agreement is binding, the $2,512,297.39, already deposited by the United States, is the just compensation for the hospital.

### Conclusions of Law.

I. The General State Authority and the Department of Property and Supplies of the Commonwealth of Pennsylvania had authority to lease the hospital to the United States.

II. The agreement fixing the just compensation in case the United States decided to acquire the hospital by judicial proceedings does not violate the Pennsylvania Administrative Code, which prohibits a state agency from selling property of the estate except with the approval of the General Assembly.

III. The United States filed its condemnation proceedings before the expiration of the term of the sublease.

IV. Upon the receipt of the War Department's notice of termination of the sublease the Commonwealth did not change its position to the extent that the United States would be estopped to assert the agreement of just compensation.

V. Just compensation is the amount specified in the sublease, $2,512,297.39.